Sam T. COSTON, Plaintiff–Appellee,

v.

PLITT THEATRES, INC.,
Defendant–Appellant.

Nos. 86–2109, 86–2137 and 86–2144.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 10, 1987.

Decided Sept. 23, 1987.

Rehearing and Rehearing En Banc
Denied Oct. 28, 1987.

Sidney Z. Karasik, Chicago, Ill., for defendant-appellant.

Daniel S. Mathless, Baum, Glick & Wetherimer, P.C., Chicago, Ill., for plaintiff-appellee.

Before COFFEY and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Sam T. Coston was discharged from his position as Operations Manager of Plitt Theatres, Inc. ("Plitt"), and brought an action under the Age Discrimination in Employment Act ("ADEA"). After a trial the jury found that Plitt had willfully violated the ADEA, and the district judge awarded liquidated damages, backpay, and attorney's fees. He denied reinstatement and front pay. Plitt appeals the sufficiency of the evidence for the verdict that it had violated the ADEA, the determination that its violation was willful, the method the district court used for calculating liquidated damages, and the award and amount of attorney's fees. Coston appeals the denials of reinstatement, front pay, and prejudgment interest. For the reasons stated below we affirm the district court's judgment in all respects except the method of calculating liquidated damages; on that issue alone we reverse and remand.

I

In 1978 at age 55 Sam T. Coston was hired by Plitt Theatres' Midwest Division as a district manager. Plitt is a national chain of movie theaters. Each district

manager was responsible for the general operation of a set of movie theaters. In addition to the district managers there was for some period of time a position entitled Operations Manager. Coston became Operations Manager in 1979 but also continued to be a District Manager. The Operations Manager in this Midwest Division in fact reported to a Vice President, Irwin Cohen. Cohen in turn reported to an Executive Vice President, Harold Klein. Klein was Plitt's chief administrative official for the Midwest Division.

When Coston became Operations Manager he received an increase in his salary. The Operations Manager was generally to inspect the theaters, engage in some collective bargaining, help district managers with local problems, help set up budgets, handle customer complaints if necessary, and serve generally as an intermediary between the district managers and the higher management. The Operations Manager position required some travel to supervise the individual theaters, but the amount of travel required was the subject of some disagreement at trial, even between Executive Vice President Klein and Vice President Cohen.

Sometime in late 1981 Plitt determined that it needed to engage in a reduction-in-force ("RIF") of its staff in order to respond to reduced business. On January 4, 1982, Cohen informed Coston in a face-to-face, one-on-one meeting of the poor business conditions and of Plitt's decision to cut expenses by, *inter alia*, eliminating several positions within the company. Coston was at that time less than sixty years of age. Cohen told Coston that the Operations Manager position was one of the positions being phased out and Coston's position was being terminated as of January 8, 1982. Coston testified that he had no disagreement with the decision to phase out the Operations Manager position, and that he realized that business had been poor and was not surprised to learn that "certain things needed to be done." Coston testified that he asked Cohen why he couldn't stay on and continue as a District Manager rather than one of the younger district managers. According to Coston, Cohen responded that one of the younger district managers (Pat Burns) had seniority with the company, and the other (Kurt Noack) was "super." Coston testified that he then asked if there were any position with Plitt Coston could fill, and Cohen replied that there was none, hesitated, and then added, "Besides, Sam, we have to go along with youth." Coston testified that he then asked if Klein knew of Coston's discharge, and Cohen replied that Klein knew of the decision (Klein in fact had made the decision) and had informed him (Cohen) that there was no other position available for Coston.

Plitt did not appoint a successor Operations Manager, but it did appoint Pat Burns, who had previously been a District Manager for another district, to add Coston's old District Manager position for the Water Tower District to his own district.

Coston brought an action against Plitt in federal district court claiming that in discharging him Plitt violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. Plitt claimed that it had discharged Coston in accordance with a RIF necessitated by poor business conditions and that Coston's discharge was appropriate under the ADEA. The case was tried to a jury, which found Plitt liable of a willful violation of the ADEA and assessed commission and bonus damages against Plitt of $9,600. Pursuant to section 626(b) Coston requested reinstatement or front pay, liquidated damages, actual damages, interest, costs, and attorney's fees. The district court denied both reinstatement and front pay, computed actual damages, and (to reach the liquidated damages figure) first doubled actual damages and then deducted amounts earned in mitigation. The court also granted costs to plaintiffs and awarded plaintiffs attorney's fees of $35,408.50.

Plitt moved for judgment notwithstanding the verdict, or in the alternative, for a new trial. The trial court denied the motions. Plitt now appeals the judgment of liability and the judgment that the liability was willful. Plitt also appeals the award of attorney's fees and the method of calcu-

lating liquidated damages. Coston appeals the denials of reinstatement and front pay and the denial of prejudgment interest.

## II

### A. Sufficiency of the Evidence

■ The plaintiff in an age discrimination suit under the ADEA has the ultimate burden of proving that age was a determining factor in his or her discharge. *E.g., Mathewson v. National Automatic Tool Co.,* 807 F.2d 87, 89 (7th Cir.1986); *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984). The plaintiff may attempt to meet this burden either through the presentation of direct proof or by utilizing the shifting burden of production method set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *E.g., Mathewson,* 807 F.2d at 89–90; *La Montagne,* 750 F.2d at 1409. Of course, the ultimate burden of persuasion remains with the plaintiff at all times. *E.g., Mathewson,* 807 F.2d at 89–90; *La Montagne,* 750 F.2d at 1409.

A plaintiff establishes a prima facie case in a reduction-in-force action under the ADEA by

> (1) showing that the plaintiff was within the protected age group; (2) showing that the plaintiff was adversely affected, either by discharge or demotion; (3) showing that the plaintiff was qualified to assume another position at the time of discharge or demotion; and (4) producing circumstantial or direct evidence from which a factfinder might reasonably conclude that the employer intended to discriminate in making the employment decision at issue.

*McNeil v. Economics Laboratory, Inc.,* 800 F.2d 111, 114 (7th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *see also Matthews v. Allis–Chalmers,* 769 F.2d 1215, 1217 (7th Cir.1985); *La Montagne,* 750 F.2d at 1409.

■ In reviewing a jury's verdict we ascertain whether there is substantial evidence in support of the verdict. *E.g., Mathewson,* 807 F.2d at 90. In applying this standard we ascertain whether the verdict finds sufficient support from the evidence presented and all the reasonable inferences that may be drawn in favor of the party winning the verdict; conflicts in the evidence must be resolved in the winning party's favor. *E.g., Mathewson,* 807 F.2d at 90; *La Montagne,* 750 F.2d at 1410. Our role is not to weigh the evidence in search of a preponderance as would a jury, but it is instead the more restrictive function of determining if the evidence in support of the verdict is *substantial;* a mere scintilla of supporting evidence will not suffice. *E.g., Mathewson,* 807 F.2d at 90; *La Montagne,* 750 F.2d at 1410.

■ Coston was undoubtedly within the protected age group and was adversely affected by his discharge. In addition, Coston admits that business conditions were poor and that steps needed to be taken to reduce costs; there is no real disagreement over the justification for a reduction-in-force at the time of the discharge. Thus the evidence at trial centered on whether Coston was qualified to assume another position at the time his was eliminated, and whether a factfinder might have reasonably concluded that the employer intended to discriminate against Coston in making the discharge decision.

The evidence at trial of Coston's competence was conflicting. There was testimony that suggested that Coston was performing competently and within the range of ability expected. In addition, Klein himself admitted that his decision to discharge Coston was made without knowledge of Cohen's assertions that Coston had performed audits improperly and without exact knowledge of Coston's record of theater visits. With regard to theater visits even the requirements for determining competence are unclear; Klein testified that Coston should have been *in* the office more and Cohen testified that Coston should have been *out* more. It is also undisputed that Coston improved the situa-

tion at Water Tower from what it had been during Noack's tenure there as district manager. Therefore there was significant, if not overwhelming, evidence that Coston's work was competent and that he was qualified to remain as a district manager.

■ The evidence regarding Plitt's intent to discriminate against Coston in his discharge includes both the setting in which the decision was made and a reason explicitly communicated to Coston for his discharge. When Coston asked if he could stay on as district manager the response provided by Cohen was that two younger managers had been chosen to remain because Burns had seniority with Plitt and because Noack was "super." Burns does appear to have had more time at Plitt, but he had served less time as a district manager. In any case, the significance of Burns's seniority as a Plitt employee was uncertain based on the evidence at trial because it is unclear in the record whether Plitt had an established seniority system, whether it was followed, and whether it was triggered by particular positions within the firm or simply by the time of initial employment with Plitt. On such a record the jury was entitled to reject the seniority allegations as pretextual.

■ In regard to Cohen's comment that Noack was super we need only reiterate that there was testimony from several witnesses at trial, including Klein, that the Watertower Theater was in poor shape during Noack's tenure there as district manager, a condition that did not recur when Coston took over as district manager there. This testimony undermines any support for the assertion that the discharge of Coston was due to a comparative evaluation of Coston's and Noack's competence. The jury was entitled to conclude that such a rationale was pretextual.

■ The direct remark of Cohen to Coston during the meeting in which Coston was discharged is the clinching evidence in this scenario. According to Coston's testimony Cohen, in summing up the reasons for Coston's discharge, said, "Besides, Sam, we have to go along with youth." While Cohen testified that he made no such remark, the decision regarding whose testimony to credit was for the jury. Appellate courts may not interfere in the often crucial credibility determinations of a jury. E.g., Mathewson, 807 F.2d at 90; Yarbrough v. Tower Oldsmobile, 789 F.2d 508, 513 (7th Cir.1986); La Montagne, 750 F.2d at 1410.

■ Plitt argues that this court's opinion in La Montagne establishes that a jury cannot attribute the discriminatory remarks and intentions of others to the official who makes the decision to discharge the employee. Plitt reads La Montagne much too broadly. In La Montagne we held that the statements of two officers inferior to the official who made the discharge decision were not probative of the discharging official's intent and did not increase or decrease the likelihood that the discharging official intended to discriminate. La Montagne, 750 F.2d at 1412. This evidence alone was thus in La Montagne insufficient to allow a reasonable jury to conclude that the discharging official had intended to discriminate.

In La Montagne the statements were made prior to the decision to discharge and were apparently not communicated to the discharged employee during any discussion of his discharge; the discharging official alone made the decision and carried it out. Here, on the other hand, Klein made the decision but Cohen carried it out. It was Cohen who told Coston of his discharge, and the discriminatory statement was made during that meeting after, of course, Klein's decision to discharge Coston. Cohen was thus carrying out Klein's orders and it was reasonable for the jury to assume that the reasons given by Cohen were those authorized by Klein. While such an inference was not mandated, it was inherently reasonable and was supported by substantial evidence.

In sum, there was substantial evidence in support of the jury's verdict that age was a determining factor in Klein's decision to discharge Coston.

### B. "Willful" Violation of the ADEA

■ The ADEA includes a "liquidated damages" provision that allows damages to

be doubled if an employer's violation of the ADEA is determined to be "willful." 29 U.S.C. § 626(b). In this action the trial court relied on *Syvock v. Milwaukee Boiler Manufacturing Co.,* 665 F.2d 149 (7th Cir. 1981), in fashioning its instruction to the jury regarding the standard for determining a "willful" violation of the ADEA. The trial court charged the jury that

> In order for the discrimination by the defendant to have been willful, the defendant's actions must have been knowing and voluntary and the defendant either knew or reasonably should have known that its actions were in violation of the law.
>
> Defendant has admitted that it was at all times aware of the illegality of age discrimination. Whether these elements of willfulness have been proved by the evidence is for you to determine.

Tr. 401; *see Syvock,* 665 F.2d at 156.

After the defendant filed its notice of appeal in this action the Supreme Court decided *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), which upheld the Second Circuit's definition that a violation of the ADEA was "willful" for the purposes of the liquidated damages provision if "the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Thurston,* 105 S.Ct. at 625. Counsel for *Plitt Theatres* argues that in light of *Thurston* we must reverse and remand the judgment below insofar as it finds that Plitt Theatres acted willfully to violate the ADEA. Coston objects that Plitt waived its right to raise the willfulness issue by not anticipating *Thurston* and therefore not objecting to the use of the *Syvock* instruction.

We do not reach the question of whether Plitt waived its right to appeal the issue of whether *Syvock* is sufficient under *Thurston* because we hold that even presuming that it did not waive its right to appeal the question, *see Rengers v. WCLR Radio Station,* 825 F.2d 160, 165 (7th Cir.1987); *see also General Beverage Sales Co. v. East-Side Winery,* 568 F.2d 1147, 1152 (7th Cir. 1978) (finding no waiver in similar circumstances); *Gilchrist v. Jim Slemons Imports, Inc.,* 803 F.2d 1488, 1494–95 (9th Cir.1986); *Robinson v. Heilman,* 563 F.2d 1304, 1307 (9th Cir.1977) (per curiam); *Hegger v. Green,* 646 F.2d 22, 26–27 (2d Cir. 1981) (relying on the reasoning of *General Beverage* ), there was no error. This court has quite recently held that the *Syvock* standard used by the trial court in this case for defining "willful" with regard to liquidated damages under the ADEA is consistent with the standard announced in *Thurston. Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 23 (June 26, 1987).[1] *Graefenhain* squarely presented the same question with which we are faced today. In that case a jury found the actions of an employer to constitute a willful violation of the ADEA under the *Syvock* standard. The trial court granted a motion for JNOV on the question of whether the ADEA was violated. A panel of this court reversed and held that the trial court had erred in granting the motion for JNOV. The *Graefenhain* panel then further held that since *Syvock* and *Thurston* are consistent the jury's determination that the violation was willful must also be affirmed. *Id.* at 23. The court in *Graefenhain* noted explicitly that "[b]ased on the record before us, we find that it is not unreasonable for the jury to have found that Pabst management knew or should have known of the ADEA's requirements and therefore that its actions were willful." *Id.* at 23. *Graefenhain* thus controls the result in this case where the jury also found an ADEA violation willful under the *Syvock* standard. While it is certainly true that an instruction of willfulness under the "reckless disregard" language approved in *Thurston* would have also been appropriate, *Graefenhain* holds that the *Syvock* instruction is also sufficient under *Thurston*. The trial court

---

**1.** We recognize that *Graefenhain* and *Rengers* appear to be inconsistent with *Powell v. Rockwell International Corp.,* 788 F.2d 279, 285–86 (5th Cir.1986). Nevertheless, we believe that the *Syvock* instruction as interpreted in *Rengers* and the instant opinion is in accord with the analysis of the ADEA provided in *Thurston.*

therefore did not err in instructing the jury via the *Syvock* definition of willfulness.

We pause at this point to stress that the *Syvock* standard does not allow a factfinder to determine that a violation of the ADEA was willful if the employer merely knew that the ADEA was "in the picture." *Thurston* rejected the suggestion that an "in the picture" standard was appropriate for determining willfulness for the purposes of authorizing liquidated damages under the ADEA because it would allow the recovery of liquidated damages even if the employer acted reasonably and in complete good faith. *Thurston*, 105 S.Ct. at 625. As a panel of this court noted recently in *Rengers v. WCLR Radio Station*, 825 F.2d 160, 166 (7th Cir.1987), the *Syvock* standard "comports with this concern because if an employer reasonably should have known that its actions were illegal, then the employer was not acting reasonably." Where the meaning of the ADEA is debatable, an employer's reasonable and good faith construction of the statute's requirements, even if erroneous, cannot be considered willful. In the case at bar, of course, no debatable requirement of the ADEA was at issue. Therefore, there is no possibility that Plitt's action was a reasonable construction of an ambiguous provision of the ADEA.

### C. Calculation of Liquidated Damages

The ADEA in general requires that courts follow the Fair Labor Standards Act ("FLSA") in the computation of damages, but it in one respect alters the FLSA's structure: under the ADEA no liquidated damages are awarded unless the plaintiff shows that a willful violation of the ADEA occurred. The statutory language is straightforward:

> Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of sections 216 and 217 of this title [the FLSA damage provisions]: *Provided,* That liquidated damages shall be pay-

able only in cases of willful violations of this chapter [the ADEA].

29 U.S.C. § 626(b).

The recent analysis provided in *Thurston* holds that Congress intended by this language to make the *standard* for granting liquidated damages punitive. 105 S.Ct. at 624–26. Coston argues that we should extend *Thurston's* analysis to establish that Congress also intended to alter the *method of calculating* liquidated damages from that applied under the FLSA. We believe that adopting Coston's position would be to violate the statutory language of the ADEA and Congress's intent behind that language. We cannot accept the argument that *Thurston* requires a result contrary to Congress's intent in a situation not before the *Thurston* Court.

*Thurston* involved, in pertinent part, a challenge to the standard by which a "willful" violation of the ADEA is defined. The Supreme Court there determined that "an acceptable way to articulate a definition of 'willful'" under the ADEA's liquidated damages provision is to ask whether "'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'" *Thurston*, 105 S.Ct. at 625–26. We are asked to determine the appropriate method of calculating liquidated damages once a willful violation is found. As the Fourth Circuit remarked in addressing the same question in light of *Thurston;* "[w]e are not concerned ... with the question of substantive liability but with a question of calculation." *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 967 (4th Cir.1985) (specifically addressing the question of whether amounts earned in mitigation of backpay should be deducted before or after doubling and determining that deductions should be made prior to doubling).

It is true, as Coston notes, that *Thurston* states that "[t]he legislative history of the ADEA indicates that Congress intended for liquidated damages to be punitive in nature." *Thurston*, 105 S.Ct. at 624.[2] This unquestionably means that

---

**2.** We recognize that there is language in a Con-

ference Committee report to a later bill amend-

courts must use a punitive standard to determine whether an ADEA violation is willful. It does not necessarily follow, however, that the method of calculating those liquidated damages (once the punitive standard has been met) must be altered in some fashion from the explicit method of calculation adopted by Congress. Congress, if it had so wished, could certainly have left the amount of liquidated damages under the ADEA to the more freewheeling sort of calculation used generally for punitive damages, but it did not do so. Instead Congress directed that "amounts owing" under the ADEA be deemed amounts owing under the FLSA. 29 U.S.C. § 626(b). The literal language of section 626(b) alters only the FLSA's scheme for *allowing* liquidated damages—they are to be "payable only in cases of willful violations...." *Id.* The statutory language does not, however, modify the FLSA's *method for calculating* those damages.

Such a legislative decision on the part of Congress is eminently sensible. Rather than leaving the method of determining the amount of punitive damages to be fought out in the courts Congress chose to tie the amount of liquidated damages to the amount of harm done in each particular situation. Thus the deterrent power of the penalty is roughly matched to the pecuniary harm incurred. Liquidated damages compensate for those losses that are "too obscure and difficult of proof for estimate other than by liquidated damages," H.R. Rep. No. 950, 95th Cong., 2d Sess. 14, *reprinted in* 1978 U.S.Code Cong. & Admin.News, 504, 528, 535 (quoting *Overnight Transportation Co. v. Missel,* 316 U.S. 572, 583–84, 62 S.Ct. 1216, 1223, 86 L.Ed. 1682 (1942) (an FLSA case)), and are not awarded absent a finding that the employer's actions have met the punitive standard embodied in the definition of a "willful" violation. Such a scheme makes use of the FLSA's liquidated damages provision, which is already in place and working, and allows for more predictable and consistent results in litigation brought for violations of the ADEA.

■ This result is also consistent with the legislative history. In a "Joint Explanatory Statement of the Committee of Conference" of the House and Senate managers of the Age Discrimination in Employment Act Amendments of 1978 the conference committee noted expressly that the "amounts owing" language of section 626(b)

ing the ADEA that appears to suggest that Congress believed that liquidated damages under the ADEA are *not* punitive. H.R.Rep. No. 950, 95th Cong. 2d Sess. 13, *reprinted in* 1978 U.S. Code Cong. & Admin.News 504, 528, 535 (Conference Committee Report to H.R. 5383, which became the Age Discrimination in Employment Amendments Act of 1978, Pub.L. No. 95–256, 92 Stat. 189 (1978)). In discussing the right to a jury trial on the factual issues underlying a claim for liquidated damages under the ADEA, the Conference Committee noted in pertinent part:

The Supreme Court recently ruled that a plaintiff is entitled to a jury trial in ADEA actions for lost wages, but it did not decide whether there is a right to jury trial on a claim for liquidated damages. *Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). Because liquidated damages are in the nature of legal relief, it is manifest that a party is entitled to have the factual issues underlying such a claim decided by a jury. The ADEA as amended by this act does not provide remedies of a punitive nature. The conferees therefore agree to permit a jury trial on the factual issues underlying a claim

for punitive damages because the Supreme Court has made clear that an award of liquidated damages under the FLSA is not a penalty but rather is available in order to provide full compensatory relief for losses that are "too obscure and difficult of proof for estimate other than by liquidated damages." *Overnight Transportation Co. v. Missel,* 316 U.S. 572, 583–84, 62 S.Ct. 1216, 1223, 86 L.Ed. 1682 (1942). H.R.Rep. No. 950, 95th Cong. 2d Sess. 13, *reprinted in* 1978 U.S.Code Cong. & Admin.News 504, 528, 535 (Conference Committee Report to H.R. 5383, which became the Age Discrimination in Employment Amendments Act of 1978, Pub.L. No. 95–256, 92 Stat. 189 (1978)). If we were considering the question of whether the standard for awarding liquidated damages is punitive on a clean slate we would of course consider the entire legislative history behind the liquidated damages provision ourselves. Nevertheless, it is equally apparent that the Supreme Court has confronted that question and spoken authoritatively: the standard for determining liquidated damages under the ADEA *is* punitive. We are therefore of course bound to proceed with that characterization in mind.

contemplates two elements: First, it includes items of pecuniary or economic loss such as wages, fringe, and other job-related benefits. Second, it includes liquidated damages (calculated as an amount equal to the pecuniary loss) which compensate the aggrieved party for nonpecuniary losses arising out of a willful violation of the ADEA.

H.R.Rep. No. 950, 95th Cong., 2d Sess. 13, *reprinted in* 1978 U.S.Code Cong. & Admin.News 504, 528, 535 (parenthetical expression in original). This legislative history thus directly requires that the *amount* of liquidated damages be determined as "an amount equal to the pecuniary loss," as part of the remedy required by section 626(b), which "incorporates the remedial scheme of sections 11(b) [29 U.S.C. § 211(b)], 16 [29 U.S.C. § 216], and 17 [29 U.S.C. § 217] of the FLSA...." *Id.* Thus the amount of actual harm done the plaintiff must be determined prior to doubling the damage award as required to establish liquidated damages. Therefore any amounts earned in mitigation of the backpay compensatory award must be deducted prior to doubling.

This result is not inconsistent with *Thurston,* for we do not here in any way suggest that liquidated damages are to be awarded without a showing that the ADEA violation was willful. Our decision on this issue affects only the calculation of the liquidated damages once the punitive standard has been met. In adopting the method of calculation we describe today we do no more than simply apply Congress's decision that the amount of such damages should be determined by the method used in the FLSA, which is based on the actual harm suffered.

The result we reach on this question is also consistent with the theory behind the bulk of the decisions of the courts of appeals regarding the assessment of liquidated damages within the remedial scheme of the ADEA. In *Fariss v. Lynchburg Foundry,* 769 F.2d 958 (4th Cir.1985), for example, the Fourth Circuit in a post-*Thurston* case faced the same question we face today and also determined that amounts earned in mitigation of backpay must be

deducted prior to determining liquidated damages under the ADEA. *Id.* at 967. More generally, the overwhelming majority of courts have treated the question of determining the amount of liquidated damages as if they were a nonpecuniary compensatory loss under the FLSA. *E.g., Fariss v. Lynchburg Foundry,* 769 F.2d 958 (4th Cir.1985); *Blim v. Western Electric Co.,* 731 F.2d 1473, 1479–80 (10th Cir.), *cert. denied,* 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984); *O'Donnell v. Georgia Osteopathic Hospital, Inc.,* 748 F.2d 1543, 1552 (11th Cir.1984), *overruled by Lindsey v. American Cast Pipe Iron Co.,* 810 F.2d 1094, 1101–02 (11th Cir.1987); *Rose v. National Record Corp.,* 703 F.2d 225, 230 (6th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1101–03 (8th Cir.1982); *Kolb v. Goldring, Inc.,* 694 F.2d 869, 875 (1st Cir.1982); *Spagnuolo v. Whirlpool Corp.,* 641 F.2d 1109, 1114 (4th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981). *Contra Lindsey v. American Cast Pipe Iron Co.,* 810 F.2d 1094, 1101–02 (11th Cir.1987); *Criswell v. Western Airlines, Inc.,* 709 F.2d 544, 556–57 (9th Cir.1983), *aff'd on other grounds,* 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985).

## D. Denial of Reinstatement

The ADEA grants broad remedial powers to enable the courts to make a plaintiff whole. *See* 29 U.S.C. § 626(b). This court has recently noted that "[a]lthough reinstatement is usually the preferred remedy, reinstatement is not always appropriate." *McNeil v. Economics Laboratory, Inc.,* 800 F.2d 111, 118 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). The decision regarding reinstatement is within the discretion of the district court, *e.g., id., Cancellier v. Federated Department Stores,* 672 F.2d 1312, 1319 (9th Cir.), *cert. denied,* 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982), and several factors may persuade the district court after careful consideration in a particular case that the preferred remedy of reinstatement is not possible or is inappro-

priate, *e.g., McNeil,* 800 F.2d 118 (hostility in the relationship or the lack of an available position may make reinstatement inappropriate). The two factors relied upon by the district court here were hostility between the employer and the employee that makes futile any reinstatement order, and the lack of an available position in which to reinstate the plaintiff.

We are of course cognizant of the legitimate concern that the hostility common to litigation not become an excuse to avoid ordering reinstatement on a general basis, and thus to frustrate the purposes of the ADEA to eradicate age discrimination and to make whole those who suffer violations. That is not what happened here. Coston had a position in which he was required to hold himself out to the public as a managerial representative of the employer. He held significant managerial, public responsibilities, including some collective bargaining and handling customer complaints. Where the employee's job profile takes him beyond responsibilities internal to the employer's business, and where those public responsibilities can fairly be perceived as managerial, the employer's legitimate concern for the public image of the business may be fatally undermined where hostility permeates the relationship between employer and employee. *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728–29 (2d. Cir.1984) (hostility may prevent reinstatement from being possible under the facts of a particular case); *Dickerson v. Deluxe Check,* 703 F.2d 276, 280 (8th Cir.1983) (sensitivity of an employee's position within a firm may make reinstatement inappropriate); *Combes v. Griffin Television, Inc.,* 421 F.Supp. 841, 846 (W.D. Okla.1976) (reinstatement as news anchorman denied because the sensitivity of the position would allow discord and antagonism to produce a "very difficult working environment, with the particular difficulty of being perceivable to the viewing audience").

In addition, Coston served as a higher level managerial representative, in a situation where the employer's or the employee's hostility could well render useless any efforts made to reinstate the employee. *E.g., McNeil,* 800 F.2d at 118; *Dickerson,* 703 F.2d at 280 (accepting the validity of decisions not to reinstate employees in "high level, unique, or unusually sensitive positions" although finding no such concerns in the case before it and ordering a remand to order reinstatement); *EEOC v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919, 926–27 (S.D.N.Y.1976), *aff'd mem.,* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977) (refusing reinstatement where the employee's job "required a close working relationship [with] top executives of defendant" and "involved frequent personal contacts with defendant's clients, with plaintiff acting as defendant's representative"). Here, Coston served effectively as the link between district managers and the higher management. Given the higher management's perceived loss of trust and confidence in Coston the district managers might well refuse to continue to use Coston as an intermediary. Moreover, even if Coston were returned to solely a district manager's position he would still be the only representative of higher management regularly to visit the theaters within his district, since his old position as Operations Manager has been abolished.

In addition, we also note that a continued reduction-in-force may make reinstatement infeasible, *e.g., McNeil,* 800 F.2d at 118; *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728–29 (2d Cir.1984); *Cancellier,* 672 F.2d at 1319 (continued reduction-in-force may make reinstatement inappropriate). In this case the district court found that no new Operations Manager was selected and that a district manager had added Coston's responsibilities as a district manager to his own. In addition, the district court found that while Plitt did create a new position entitled "district manager-in-training" Plitt did not anticipate any promotion of the district-manager-in-training to full district manager. There was conflicting evidence on this point and thus these findings are not clearly erroneous in light of support within the record. Thus, while this factor alone might not

allow refusal of reinstatement we believe it weighs in support of our determination that the district court did not abuse its discretion in denying reinstatement.

▮ Coston has also challenged the district court's refusal to order reinstatement on the ground that the jury's verdict should have foreclosed the district court from relying on the employer's belief that Coston was incompetent in making his decision regarding reinstatement. Coston's position, however, misunderstands the meaning of an ADEA violation. Such a finding only requires that age in fact be a determining factor in the employer's decision to discharge, whatever the employer's belief regarding competence. *La Montagne*, 750 F.2d at 1409. Thus the jury here need not have found that the employer believed Coston to be competent.

While we recognize that portions of the district court's discussion of reinstatement might appear to question Coston's competence when read alone, a review of the entire discussion reveals that the district court was not passing on Coston's competence but instead noting the effect of the employer's belief of Coston's incompetence on the desirability of reinstatement. The district court stated in pertinent part that:

> There also seems to be some question as to the quality of plaintiff's work. Evidence at trial indicated *defendant's dissatisfaction* with the quality of plaintiffs [sic] work. Furthermore, defendant states in its response that plaintiff improperly delegated responsibilities, had trouble making decisions on his own, failed to visit some theaters in his district and visited others infrequently. Ordering plaintiff back to his former position with Plitt Theatres would not be a productive solution *given defendant's dissatisfaction* with the quality of plaintiff's work.

District Court's Order of October 3, 1984 at 4 (*inter alia* denying reinstatement) (emphasis added). The demeanor of the parties and witnesses crucial to such a difficult, but perfectly plausible, determination was within the observation of the district judge and is supported by the record; we

cannot say that the trial court's factual determination was clearly erroneous or that its ultimate decision not to reinstate Coston was an abuse of its discretion. *See Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1099–1100 & n. 6 (8th Cir.1982) (performing a similar review of whether a district court's findings underlying a discretionary equitable decision were consistent with the jury's verdict); *Cancellier v. Federated Department Stores*, 672 F.2d at 1319 (upholding a district court's decision to refuse reinstatement in part in reliance on the district court's findings of hostility, including the employer's "numerous attacks during trial on plaintiff's abilities"); *see also Horn v. Duke Homes, Division of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 607 (7th Cir.1985) (factual findings by a trial judge in determination of whether a plaintiff had proved her damages is subject to the clearly erroneous standard rather than abuse of discretion, citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 2374, 45 L.Ed.2d 280 (1975)).

Given such concerns we cannot say that the decision of the experienced trial judge to refuse reinstatement under the circumstances of this case was an abuse of discretion.

### E. Denial of Front Pay

The ADEA authorizes district courts to structure remedies to make plaintiffs whole for violations of the ADEA. Thus, this circuit has recently held that "front pay may be an available remedy in an appropriate case." *McNeil*, 800 F.2d at 118. In deciding whether front pay is appropriate, we have noted that the district court in its discretion should consider the circumstances of each particular case, and should note such factors as whether: the plaintiff has a reasonable prospect of obtaining comparable employment; the time period for the award of front pay is relatively short; and whether liquidated damages have been awarded (and if so, in what amount). *McNeil*, 800 F.2d at 118–19.

▮ In this case the district court denied front pay after noting the speculative nature of the remedy on the facts in the

record before it. The district court noted that neither party presented any evidence regarding a discount rate and also suggested that neither party "specifically address[ed] the issue of whether the plaintiff intended to work, or was physically capable of working, until his full retirement age." The district court also noted that Coston in his complaint asked only for "lost wages" and in his pretrial submissions did not raise the question of front pay.[3]

Despite the indication in the pretrial memorandum that Coston wished front pay if reinstatement was not awarded, Coston's counsel was entirely silent at trial on the issue of front pay. He did try to the jury the facts concerning bonuses and commissions for the purposes of backpay, and he also submitted (with Plitt's counsel's agreement) a stipulation to the judge regarding salary and earnings in mitigation, also explicitly for the purposes of backpay. But he never offered any evidence or argument in regard to the issue of front pay, either before the jury or to the judge. He neither tendered to the judge a proposed jury instruction regarding front pay calculations nor even suggested whether he intended to try the amount of any such front pay award to the jury or to the bench.[4]

Thus it is not surprising that Plitt's counsel offered no evidence or argument regarding front pay during the trial; he had seen only the ambiguous "lost wages" remark in the complaint, and while he would have seen the alternative front pay request in the pretrial memorandum he was entitled to assume from the lack of any proof or argument at trial that Coston's counsel had chosen to rest his future damages claim solely on an order for reinstatement.[5] In similar fashion, it is entirely unremarkable that the trial judge should have been surprised by the posttrial resurrection of the pretrial memorandum's argument for front pay as an alternative remedy to reinstatement.

We recognize that the courts of appeals have made forceful statements that front pay is necessary in order to make plaintiffs whole if reinstatement is not ordered. *E.g., Maxfield v. Sinclair International,* 766 F.2d 788, 795–96 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); *EEOC v. Prudential Federal Savings and Loan Association,* 763 F.2d 1166, 1172–73 (10th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985); *Whittlesey v. Union Carbide Corp., Inc.,* 742 F.2d 724, 728 (2d Cir.1984). Nevertheless, we have no occasion to decide today the strength of such arguments or how they ought to affect the trial court's discretion to award front pay in this particular case. The simple fact of the matter is that in the circumstances of

3. Coston has argued that the district court incorrectly read the record and pleadings in his determination regarding front pay. While we have some minor concerns regarding some comments within the district court's discussion we believe that it is abundantly clear that the district judge's ruling was not an abuse of discretion based on the record established in the case. The district court's discussion of the front pay issue apparently overlooked Coston's request for front pay (if reinstatement were not ordered) in his pretrial memorandum. The district court also apparently did not note the statement of Coston in the trial testimony that "I was in hopes I could spend the remaining working years of my life with Plitt, but I guess it's just not to be." While this testimony was given in regard to a conversation Coston had with Executive Vice President Klein a few days after he was notified of his discharge, we believe that especially when the statement is considered together with Coston's claim for reinstatement, it represents some evidence of Coston's intent at the time of trial to continue working until some retirement age. Nonetheless, we believe that the district court's failure to take into account these items does not, considering the other overwhelming speculative factors involved in computing front pay in this case, suggest any abuse of discretion by the trial court.

4. We have no occasion in this opinion to consider whether any or all of the underlying factual elements of an equitable award of front pay damages should be submitted to a jury absent the parties' agreement to try such facts to the trial judge. Authority and reason both suggest that while the decision to award front pay is within the discretion of the trial court, the amount of damages available is a jury question. *E.g., Maxfield v. Sinclair International,* 766 F.2d 788, 796 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986).

5. Our opinion today rests solely on the failure to present even a reasonable theory of a front pay award to the judge or jury during the trial.

the case before us the trial judge was offered virtually none of the information from which a reasonably certain award of front pay could have been calculated, even assuming that the trial judge was the proper factfinder to make such a determination. *Cf. Williamson v. Handy Button,* 817 F.2d 1290, 1297 (7th Cir.1987) (noting that even where prejudgment interest would otherwise be awarded a denial of prejudgment interest is proper where the amount is not reasonably ascertainable).

Perusal of the backpay stipulation undermines Coston's implied reliance on that document before this court, for the document itself purports only to establish payments for various components of *backpay*—the stipulation is entitled *STIPULATION AS TO AMOUNT OF BACKPAY AND BENEFITS,* which, fairly read, refers to income lost during the backpay period due to Coston's loss of salary and commissions. There is no indication in the document that it purports to establish figures for front pay calculations, and we think any such inference patently unjustifiable in light of the failure of Coston before or at trial to make any overt statement of reliance on the stipulation for the purposes of front pay. Such a use of the stipulation would clearly exceed the scope of the terms to which the opposing party can fairly be considered to have agreed. While it is true that the stipulation purports to establish per diem rates for components of income for days after March 31, 1984, the title of the stipulation referencing only backpay and the repeated references within the document to backpay make it abundantly clear that Plitt's counsel was agreeing only to those amounts for the purposes of backpay and in no way intended to bind Plitt to any agreement regarding the appropriate figures with which to calculate front pay. Thus there is no evidence in the stipulation itself or elsewhere in the trial record regarding the appropriate amount of any front pay award.

This uncertainty is compounded by the fact that Coston's pay at Plitt was composed of several distinct elements, all of which would have had to have been in some manner prognosticated for the future. According to the backpay stipulation Coston was not only paid a basic wage but also was offered certain bonuses and commissions. The rates for these bonuses and commissions in 1981 and 1982 were established by the joint backpay stipulation and Coston argued to the jury the appropriate amounts for the backpay period. However, he never presented any forecast of future bonuses and commissions. In addition, there is an amount labelled "gross lost non-wage benefits" in the backpay stipulation, and Coston offered no evidence regarding the appropriate future remuneration for those benefits (or evidence regarding of what such "non-wage" benefits consisted). Moreover, there was no evidence offered regarding whether Coston intended in the future (if he was not reinstated) to continue in the work that provided the amounts earned in mitigation of the backpay award.

Finally, as the district court noted, there was absolutely no evidence offered with regard to what discount rate would be appropriate to discount the future pay award to present value. While some courts have adopted particular rates to use for discounting future awards in the absence of testimony from the parties, *see, e.g., Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30, 40 (2d Cir.1980) (adopting a 2% discount rate adjustment for inflation absent testimony from the litigants), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981); *McCrann v. United States Lines, Inc.,* 803 F.2d 771 (2d Cir. 1986) (applying *Doca* ), there is no such rule in this circuit. This court requires "district judges in this circuit to indicate the steps by which they arrive at damage awards for lost future earnings," *O'Shea v. Riverway Towing Co.,* 677 F.2d 1194, 1201 (7th Cir.1982), and we have described that a "responsible calculation of lost future earnings would ... require[ ] estimating first what [an individual's] salary would have been in each year until his retirement, then the probability that he would actually be alive and working in those years, and finally the correct discount rate by which to reduce the estimated future earnings to a

present, lump-sum value." *United States v. Fountain*, 768 F.2d 790, 802 (7th Cir.), *modified on other grounds*, 777 F.2d 345 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986); *see also Nemmers v. United States*, 795 F.2d 628, 633–34 (7th Cir.1986) (discussing application of the *O'Shea* procedure and noting district court's at least partial reliance upon expert testimony in the record); *cf. Williamson*, 1296–97 (suggesting in dicta that a trial court might be able to use a 2% discount rate in calculating damages without mentioning whether the trial court could adopt such a figure absent record testimony). Thus while we have no reason today to resolve the question of whether a district court could adopt a discount rate in the absence of record testimony, it is readily apparent that the absence of any such testimony increases the speculative nature of any award for front pay. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) (canvassing varying methods of determining discount rates and rules of various common-law courts regarding those methods).

While courts are authorized, as Coston notes, to award the damages justified on the facts proven in the record in the individual case even without an explicit request for such relief, *e.g., Williamson v. Handy Button Co.*, 817 F.2d 1290, 1297–99 (7th Cir.1987); *Kaszuk v. Bakery and Confectionery Union*, 791 F.2d 548, 559 (7th Cir. 1986), there was absolutely no evidence produced in this record regarding many of the elements essential to structure a reasonable front pay award. The district judge was well within his discretion to deny an award of front pay under the circumstances of this case.[6]

## F. Denial of Prejudgment Interest

We have recently held in an age discrimination action that to allow awards of both prejudgment interest and liquidated damages would be to provide "compensation beyond that contemplated by Congress when it authorized awards of liquidated damages under § 626." *Kossman v. Calumet County*, 800 F.2d 697, 702–03 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1294, 94 L.Ed.2d 151 (1987). In addition, all but one of the federal circuits that faced the issue prior to *Thurston* reached the same result. *Blim v. Western Electric Co.*, 731 F.2d 1473, 1479–80 (10th Cir.), *cert. denied*, 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984); *O'Donnell v. Georgia Osteopathic Hospital, Inc.*, 748 F.2d 1543, 1552 (11th Cir.1984), *overruled by Lindsey v. American Cast Pipe Iron Co.*, 810 F.2d 1094, 1101–02 (11th Cir.1987); *Rose v. National Cash Register Corp.*, 703 F.2d 225, 230 (6th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1101–03 (8th Cir.1982); *Kolb v. Goldring, Inc.*, 694 F.2d 869, 875 (1st Cir.1982); *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1114 (4th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981). *Contra Criswell v. Western Airlines, Inc.,*

---

**6.** We note for the sake of clarity that our discussion here does not address, much less decide, which party should carry the burden of proof with regard to the amount of front pay to be awarded. We hold here only that the statement in a pretrial memorandum of a proposed form of calculation does not discharge the plaintiff's duty in an ADEA case to come forward at trial with some evidence from which a reasonable calculation of a front pay award can be constructed. *Compare, e.g., Walker v. Ford Motor Co.*, 684 F.2d 1355, 1362 (11th Cir.1982) (adopting as a "broad rule of Title VII damages" the requirement that in fixed-term employment cases "a plaintiff must initially introduce some evidence showing that the economic injury resulting from the discharge extended beyond the employment term" but given such evidence, placing burden of persuasion on the defendant to show that the plaintiff discriminated against would not have remained employed beyond the contract term) *and Archambault v. United Computing Systems, Inc.*, 786 F.2d 1507, 1514–15 (11th Cir.1986) (indicating that *Walker's* discussion of burdens of proof is applicable to similar situations under the ADEA) *with Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1100 n. 7 (8th Cir.1982) (noting in reference to a finding regarding how long an employee would have retained his position absent a discriminatory discharge that "[w]e believe that in an ADEA action, the plaintiff bears the ultimate burden of persuasion on damages issues").

709 F.2d 544, 556–57 (9th Cir.1983), *aff'd on other grounds,* 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985).

Nevertheless, we must take note of the fact that a divided panel of the Eleventh Circuit has very recently disavowed that circuit's earlier *O'Donnell* decision (and created a conflict with our post-*Thurston* decision in *Kossman* ), which had joined the overwhelming majority of the circuits. The *Lindsey* court held that both prejudgment interest and liquidated damages may be allowed in an ADEA case. *Lindsey v. American Cast Pipe Iron Co.,* 810 F.2d 1094, 1101–02 (11th Cir.1987). The *Lindsey* majority claims that *Thurston's* announcement that "Congress intended for liquidated damages to be punitive in nature," *Thurston,* 105 S.Ct. at 624, undermines the rationale of the opinions barring the award of both liquidated damages and prejudgment interest in the same ADEA action. The rationale supporting the majority rule has been that liquidated damages under the ADEA are to provide for otherwise difficult to calculate costs such as the loss of the use of unpaid wages. *E.g., Kossman,* 800 F.2d at 702–03. Therefore, to allow prejudgment interest would double a successful ADEA plaintiff's recovery, since that prejudgment interest is designed to compensate the plaintiff for the loss of the use of the unpaid wages.

As Judge Vance noted in his dissent in *Lindsey,* Congress in the ADEA explicitly mandated the amounts owing under the ADEA are to be deemed amounts owing under the FLSA. *See* 29 U.S.C. § 626(b); *Lindsey,* 810 F.2d at 1102 (Vance, J., dissenting). The only qualification to the command to look to the FLSA to determine damages under the ADEA is the condition that under the ADEA liquidated damages will only be awarded upon a finding that the violation of the ADEA was willful. Congress's language is unmistakable and therefore we repeat it once again:

> Amounts owing to a person as a violation of this chapter [the ADEA] shall be deemed to be unpaid wages or unpaid

overtime compensation for the purposes of sections 216 and 217 of this title: *Provided,* That liquidated damages shall be payable only in cases of willful violations of this chapter.

29 U.S.C. 626(b) (sections "216 and 217 of this title" are the primary sections establishing damages under the FLSA). The only proviso, as we have noted before in this opinion, *see supra* section IIC, requires liquidated damages under the ADEA to be awarded according to a punitive standard. Therefore, the calculation of the amount of each award must obey Congress's mandate to follow the provisions of the FLSA for calculating damages.

Thus *Thurston* does not undermine the rationale of *Kossman* and the many other decisions reaching the same result; while *Thurston* requires that liquidated damages only be awarded after a punitive standard has been met, *Thurston* does not determine how those damages shall be calculated. This is an unexceptionable result, considering Congress's explicit mandate in section 626(b) that ADEA damages are to be calculated as FLSA damages are calculated.

■ It is settled that under the FLSA prejudgment interest is not allowed where liquidated damages have been awarded. *See, e.g., Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 715–16, 65 S.Ct. 895, 906, 89 L.Ed. 1296 (1945); *Gibson,* 695 F.2d at 1102; *Masters v. Maryland Management Co.,* 493 F.2d 1329, 1334 (4th Cir. 1974); *see also Overnight Transportation Co. v. Missel,* 316 U.S. 572, 583–84, 62 S.Ct. 1216, 1223, 86 L.Ed. 1682 (1942). The courts determining damages in ADEA cases should not whittle into the damages analysis required by the FLSA simply because the result might be different if one looked at the ADEA as a separate animal from the FLSA and ignored the congressional command to look to the FLSA for damages. The decision to provide damages to ADEA plaintiffs as if they were FLSA damages is a decision made by Congress that precludes the courts from "legislating" their own favored remedies. We re-

main convinced of the accuracy of the result in our 1986 opinion in *Kossman,* and we thus hold that in ADEA cases prejudgment interest may not be awarded where liquidated damages are also awarded.[7]

### G. Award of Attorney's Fees

■ Plitt also attacks the award of attorney's fees under 42 U.S.C. § 1988 to the prevailing plaintiff in this case as excessive. Plitt complains that the failure of Coston's counsel to gain an award of front pay requires a reduction of the lodestar amount in the case, that is, the amount resulting from the multiplication of the hours worked on the case by a reasonable hourly rate. *See, e.g., Hensley v. Eckherhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983); *Spanish Action Committee of Chicago v. City of Chicago,* 811 F.2d 1129, 1132–33 (7th Cir. 1987). The decision regarding the amount of the fee award is within the district court's discretion. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1491; *Spanish Action Committee,* 811 F.2d at 1134. The plaintiff achieved substantial relief on the claims brought and lost no separable claim. Front pay was merely a possible component of relief, not a separate cause of action. In addition, the work involved in pressing that remedy was substantially similar to the analysis and research required to establish a basis for damages for backpay. While Plitt also complains that the fee rate was excessive for the character of the work performed, the district court determined that the hours claimed reflected a "very reasonable number of hours" and the record supports that determination. The process used by the district judge to determine the amount of attorney's fees complies with that mandated in *Hensley* as applied in this circuit. *See, e.g., Spanish Action Committee,* 811 F.2d at 1133–34. The district court committed no abuse of discretion in its award.

### III

Pursuant to this opinion, the decision of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion. Circuit Rule 36 shall not apply. Costs to appellant.

MANION, Circuit Judge, concurring in part.

I join in the majority's thorough and well-reasoned opinion. I write separately only to discuss our holding that the "knew or should have known" standard for willfulness enunciated in *Syvock v. Milwaukee Boiler Manufacturing Co.,* 665 F.2d 149 (7th Cir.1981), is consistent with the Su-

---

7. The rule of law that in ADEA cases prejudgment interest cannot be allowed in addition to an award of liquidated damages is, as we have said, based on the reasoning that liquidated damages under the ADEA in part account for harm otherwise difficult to calculate, an example of which is the value of the use of income lost due to discrimination. *See, e.g., Kossman,* 800 F.2d at 702–03; *see also Heiar v. Crawford County,* 746 F.2d 1190, 1202 (7th Cir.1984) (suggesting that liquidated damages under the ADEA may have been intended "in whole or part to compensate victims of willful violations for other items of damage, such as delay . . ."), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985). Our reasoning here is based on the particular method under the ADEA of calculating liquidated damages. Therefore, our decision today does not suggest that prejudgment interest may not be allowed in addition to punitive damages under other statutes. *See, e.g., Williamson v. Handy Button Co.,* 817 F.2d 1290

(7th Cir.1987) (reversing and remanding a decision not to allow prejudgment interest where punitive damages were awarded in order for the district court to determine if the amount of prejudgment interest was readily ascertainable in a case under 42 U.S.C. § 1981). Nor does our decision today affect the rule that absent an award of liquidated damages the decision to award prejudgment interest in an ADEA case is within the discretion of the trial court. *Kossman,* 800 F.2d at 702; *Heiar,* 746 F.2d at 1201. *Cf. Hunter v. Allis-Chalmers Corp.,* 797 F.2d 1417, 1426 (7th Cir.1986) (noting in a case brought under Title VII and 42 U.S.C. § 1981 that "[t]he curious thing about cases dealing with the award of prejudgment interest to federal civil rights plaintiffs is that most cases treat it as a matter within the discretion of the district court judge, even when, as in this case, the principal to which it is sought to be affixed is an award of backpay under a civil rights statute.") (obiter dictum).

preme Court's decision in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). This conclusion is mandated because two recent decisions of this circuit, *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13 (7th Cir. 1987) and *Rengers v. WCLR Radio Station*, 825 F.2d 160 (7th Cir.1987) have held that *Syvock's* "knew or should have known" standard was acceptable under *Thurston*.[1] Although those precedents control our decision, I question their application of *Thurston*.

Since *Thurston*, every other circuit addressing willfulness in ADEA disparate treatment cases has adopted the "knew or showed reckless disregard" standard found to be acceptable in *Thurston*, see *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1435 (4th Cir.1985, *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 285–86 (5th Cir.1986); *Williams v. Caterpillar Tractor Co.*, 770 F.2d 47, 50–51 (6th Cir. 1985); *Nolting v. Yellow Freight System, Inc.*, 799 F.2d 1192, 1197–98 (8th Cir.1986); *Gilchrist v. Jim Slemons Imports, Inc.*, 803 F.2d 1488, 1495–96 (9th Cir.1986); *Smith v. Consolidated Mutual Water Co.*, 787 F.2d 1441, 1443 (10th Cir.1986); *Lindsey v. American Cast Iron Pipe Co.*, 810 F.2d 1094, 1099–1100 (11th Cir.1987), except for the Third Circuit, which has adopted a higher "outrageousness" standard for liquidated damage awards in individual disparate treatment cases. *Dreyer v. Arco Chemical*, 801 F.2d 651, 657–58 (3d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987). In *Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 285–86 (5th Cir.1986) the Fifth Circuit specifically rejected a "knew or should have known" instruction as being inconsistent

with *Thurston*. Although there is some conflict over the effect of the failure to apply the willfulness standard, *compare Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1435 (4th Cir.1985) (reverses and remands district court's failure to give proper willfulness instruction) *with Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 285–86 (5th Cir.1986) (holds error to be harmless), the Seventh Circuit appears to stand alone in applying a less stringent standard than the "knew or showed reckless disregard" standard found to be acceptable by the Supreme Court in *Thurston*.

*Syvock's* "should have known" standard and *Thurston's* "reckless disregard" standard cannot peacefully coexist. *Syvock* only requires negligence as a threshold for finding willfulness; *Thurston* requires recklessness. The law has always made a large distinction between negligent and reckless conduct particularly regarding the award of punitive damages. Given that *Thurston* states that the award of liquidated damages is punitive in nature, see 469 U.S. at 125, 105 S.Ct. at 624, *Syvock's* "should have known" standard does not square with either the language or the rationale of *Thurston*.

This circuit's persistence in retaining the *Syvock* standard will cause confusion. Plaintiffs will request a *Syvock* instruction, defendants will request a *Thurston* instruction. The loser will appeal if his instruction is rejected (or if both instructions are given!); at that point we will face this dilemma once again. We cannot reverse a *Thurston* instruction when the Supreme Court has found it acceptable. On the other hand, *Graefenhain* and *Rengers* tell us we must uphold a *Syvock* instruction. Absent the adoption of a novel theory that recklessness and negligence are indistin-

---

1. It should be noted that this circuit has treated ADEA "retaliation" cases differently from other types of disparate treatment violations. In *Rose v. Hearst Magazines*, 814 F.2d 491, 493 (7th Cir.1987), the court held that it was inherently inconsistent for a jury to find that an employer discriminated against an employee because the employee filed a discrimination claim and that the employer had not acted willfully. In other words, the court treated the issue of liability and willfulness as the same question. As a practical matter, single-tiered liability is imposed. For willfulness purposes, however, a "retaliation" case would seem to be no different from any other disparate treatment case. In either case the jury simply finds that a prohibited factor (age or the filing of a claim) motivated the employer's conduct.

guishable, we cannot justify the conflict. While the Third Circuit may have taken an extra step in *Dreyer v. Arco Chemical*, 801 F.2d at 657–58 by requiring outrageous conduct to be shown before liquidated damages may be awarded, this circuit refuses to take the step necessary to be in line with *Thurston* and with the other circuits that have addressed this issue.

In addition to the *Thurston* conflict, any future review of the willfulness issue should clearly explain that the "knew" part of either a "knew or showed reckless disregard" standard (*Thurston*) or a "knew or should have known" standard (*Syvock*) means that the employer *knew he was violating* the ADEA. The Supreme Court has emphasized that willfulness is not established merely by showing that the ADEA was violated and that the employer *knew* of the ADEA. *Thurston*, 469 U.S. at 127–28, 105 S.Ct. at 625. Stating the *Syvock* or *Thurston* standard without further clarification concerning what is meant by "knew" leaves an unacceptably high risk that the jury will impose liquidated damages simply because the employer knew the ADEA existed.

In sum, our decision in this matter is controlled by this circuit's precedent in *Graefenhain* and *Rengers*. Those precedents, however, need our reexamination in light of the discrepancy between the standards presented in *Thurston* and *Syvock*. If we do not reconcile that discrepancy we will create unnecessary confusion throughout the circuit on the proper definition of a willful violation of the ADEA.