John FORTINO, Carl Meyers, F. William Schulz and Sophie Mustachio, Plaintiffs,

v.

QUASAR COMPANY, A DIVISION OF MATSUSHITA ELECTRIC CORPORATION OF AMERICA, Defendant.

No. 87 C 4386.

United States District Court, N.D. Illinois, E.D.

Dec. 7, 1990.

Michael A. Reiter, Norman B. Berger, Holleb & Coff, Chicago, Ill., for plaintiffs.

Steven L. Bashwiner, Brian A. Bulger, Timothy J. Patenode, Gail A. Chaney, Katten Muchin & Zavis, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

This employment discrimination case is before the court for a decision on the merits with respect to Plaintiffs' John Fortino ("Fortino"), Carl Meyers ("Meyers") and F.

William Schulz ("Schulz") Title VII claims. Plaintiffs Fortino, Meyers, Schulz and Sophie Mustachio ("Mustachio") originally filed this action alleging that defendant Quasar Company discriminated against them on the basis of their age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 631 *et seq.*, and their national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The court heard the plaintiffs' age claims and the national origin claims were simultaneously tried to a jury. Prior to the start of the trial, Mustachio voluntarily dismissed her Title VII national original claim. With respect to the age discrimination claims, the jury returned a verdict in favor of Fortino, Meyers and Schulz and against Quasar and awarded damages in the amount of $1,949,-980, representing award of back and front pay. The jury also found that Quasar willfully violated the ADEA and the court doubled the jury's back pay award and awarded liquidated damages in the amount of $467,650. The jury returned a verdict in favor of Quasar and against Mustachio on her claim of age discrimination. Certain portions of the testimony and evidence presented at the trial before the jury related to both actions. Trial testimony and evidence strictly related to the Title VII national origin claims was presented outside the presence of the jury.

After hearing testimony, reviewing the trial transcripts and exhibits in their entirety, and examining the credible evidence of record, the court enters judgment in favor of plaintiffs Fortino, Meyers and Schulz and against Quasar Company with respect to the Title VII claims. The court also denies the plaintiffs' motion for prejudgment interest. Defendant's motion to amend the judgment is granted in part and denied in part.

## I. FINDINGS OF FACTS

### A. *The Parties*

1. Quasar Company ("Quasar") is an unincorporated division of Matsushita Electric Corporation of America ("Matsushita").

Matsushita, a Delaware corporation, is a wholly-owned subsidiary of Matsushita Electric Industrial Company, Ltd. ("MEI"), a multi-national Japanese electronics company which has its headquarters in Osaka, Japan.

2. In 1974, Quasar became a separate division within Matsushita when Matsushita purchased certain assets of Motorola Company, which was located in Franklin Park, Illinois. In the late 1970s, Quasar's operations were divided between two Matsushita divisions—Quasar and Matsushita Industrial Company. Matsushita's other divisions include the Panasonic Company and Technics. From 1974 through at least July, 1986, Quasar maintained its headquarters and principal place of business at the Franklin Park location.

3. Quasar does not manufacture the products it sells. It purchases consumer electronics goods manufactured by MEI divisions and affiliates located in Japan, Singapore and the United States, and resells these products in the United States. These products include black and white and color televisions, video cassette recorders, audio equipment, microwave ovens, air-conditioning units and other home appliances.

4. At the time of the trial in this action, the chief operating officers of Quasar were Jack Pluckhan ("Pluckhan"), its president, and Kenichi Nishikawa ("Nishikawa"), its executive vice-president. Nishikawa is Japanese. Nishikawa rose through the ranks of MEI in Japan, and was sent to Quasar by MEI in March, 1986. Prior to February, 1987, Pluckhan reported to Kiyoshi Seki ("Seki"), then President of Matsushita. Since then, Pluckhan has reported to Akira Imura ("Imura"), Seki's successor as Matsushita's president. William Schupp ("Schupp") is the chief personnel officer at Quasar.

5. John Fortino ("Fortino") is a native-born American citizen. Fortino was born on March 2, 1930. On the date of his discharge by Quasar, Fortino was 56 years old.

6. In 1958, Fortino joined Zenith in its sales training department. Fortino became Zenith's Regional Sales Manager for its mid-south zone. In that capacity, Fortino supervised the sale of all of Zenith's electronics products and oversaw the independent distributors in his zone. Fortino was a Zenith regional sales manager for 13 years.

7. On July 1, 1976, Fortino left Zenith to work for Quasar. Fortino's first position at Quasar was Director of Sales for its western zone. In that position, Fortino's responsibilities included supervising all sales operations in the twenty-five state western zone, including sales operations of the independent distributors. Five regional sales managers reported to Fortino.

8. In March, 1979, Quasar promoted Fortino to the position of Manager of Sales Promotions and Training Department. Fortino's duties included coordinating all promotional materials used by Quasar in the field, producing Quasar's press releases and creating and disseminating information concerning Quasar's new products. Subsequently, Quasar promoted Fortino to the position of Assistant General Manager of Advertising, Sales Promotions and Public Relations Department. Between 1980 and 1985, Fortino supervised all advertising, public relations and sales promotions functions of Quasar.

9. During the entire ten years that Fortino worked for Quasar, Fortino received favorable performance reviews, was promoted regularly and received significant salary increases. Both Robert Wiles ("Wiles") and Tony Mirabelli ("Mirabelli"), two of Fortino's supervisors, testified, without contradiction, that Fortino was an excellent employee. Fortino's department received awards for outstanding performance.

10. Fortino does not speak Japanese. Fortino often spoke to the Japanese management people employed by Quasar in English. As part of his duties with Quasar, Fortino visited Japan annually. During these annual visits, Fortino visited the factories and corporate headquarters in Japan, and met with MEI's Japanese advertising people. All of the MEI people with whom Fortino met spoke English.

11. Carl Meyers ("Meyers") is a native-born American citizen. Meyers was born on October 14, 1935. In 1986, on the date of his discharge by Quasar, Meyers was 50 years old.

12. On August 31, 1977, Quasar employed Meyers as a Regional Sales Manager. In that capacity, Meyers assumed sales responsibilities for all of Quasar's electronics goods in his region. Meyers also trained distributors in the sales of Quasar's products. In his first fifteen months with Quasar, Meyers received first place in a Quasar quarterly sales contest and second place in another quarterly sales contest. Meyers also was the chief communications link between MEI's factories and Quasar's independent distributors. Two of his superiors, Wiles and Fortino, testified, without contradiction, that Meyers was an excellent employee.

13. In 1980, Quasar promoted Meyers to Manager of Sales Administration. In that capacity, Meyers coordinated all of Quasar's sales materials and pricing information. Meyers reported to Quasar's General Sales Manager. Like Fortino, Meyers received steady raises while employed by Quasar.

14. With the exception of one evaluation period, Meyers received good evaluations. With respect to the evaluation which was below standard, Meyers testified that it was a reflection of personality conflict with Alan Walters, Meyers' supervisor at that time. Quasar did not contradict Meyer's testimony on this point. This court finds that Meyers met Quasar's standards as an employee and that his performance was not a basis for his termination.

15. F. William Schulz ("Schulz") is a native-born American citizen. Schulz was born on November 11, 1934. On July 31, 1986, the date of his discharge by Quasar, Schulz was 51 years old.

16. Upon graduation from college in 1957, Schulz was employed at Motorola Corporation, Quasar's predecessor, at its Franklin Park facility. From the time Schulz began his employment with Motorola until 1970, Schulz held a number of different positions in the Market Research Department of Motorola. Schulz' duties included market research, market forecasting, new product development and work with the field sales force. Schulz progressed to Assistant Manager of the Marketing Department of Motorola and supervised a number of employees.

17. In 1970, Motorola promoted Schulz to the position of head of the Order Administration Department. Essentially, Schulz supervised the in-house sales staff and acted as a liaison between the sales staff and the warehouse department.

18. After Matsushita purchased the Consumer Electronics Division of Motorola in 1974 and renamed it Quasar, Schulz retained his position as head of the Order Administration Department. In addition, Schulz began to assume responsibilities for supervising Quasar's warehousing, inventory control, domestic traffic and fleet operation functions. At this juncture of his career, Schulz supervised forty-five employees in Franklin Park, eighteen in Quincy, eight in the Service Department and four in the Traffic Department.

19. In 1978, Quasar changed Schulz' title to National Manager of Physical Distribution. Schulz continued to supervise five Quasar departments, along with approximately 80 employees including five department managers. Schulz prepared the budgets for all five departments. Schulz remained in this position until Quasar discharged him in June, 1986.

20. Like Fortino and Meyers, Schulz received good performance evaluations, regular promotions and steady pay raises.

B. *The Reorganization of Quasar*

21. In 1985, Quasar suffered operating losses of approximately $20 million dollars. As a result, MEI sent Nishikawa to Quasar as its executive vice-president, to make Quasar a profitable division of Matsushita. Nishikawa's appointment as executive vice-president of Quasar and the reorganization of Quasar were discussed by Seki, Matsushita's president and Mr. Tami, MEI's president.

22. After studying certain documents reflecting Quasar's financial condition and

organization, and with knowledge obtained about Quasar in the course of his employment at Panasonic, another division of Matsushita, Nishikawa concluded that Quasar's losses could be reduced by lowering excessive fixed costs.

23. During the fourth quarter of 1985 and the first and second quarters of 1986, MEI planned the reorganization of Quasar. During this time, Japanese officers of MEI held discussions with various Japanese officers of Quasar. As a result of these discussions, MEI also decided to reorganize Quasar's method of product distribution.

24. After returning from Japan, Nishikawa arrived at Quasar in March, 1986. Nishikawa immediately met with all of Quasar's managerial employees of Japanese national origin and discussed with them a reorganization of Quasar, which included reducing Quasar's work force by approximately 50% ("the reduction in force or RIF"). Nishikawa continued to meet with Quasar's managerial employees of Japanese national origin concerning the reorganization throughout the reorganization, which was concluded in December, 1986. All non-Japanese members of Quasar's management were excluded from these meetings. With the exception of Schupp and Pluckhan, Nishikawa excluded Quasar's managerial employees of American national origin entirely from the decision-making process regarding Quasar's operations and the impending reorganization. During the reorganization, Nishikawa issued unilateral directives to the Quasar employees of American national origin concerning the operations of Quasar.

25. The reorganization began in May, 1986, and was substantially completed by December, 1986. Also, in 1986, in connection with the reorganization, Quasar moved its headquarters and plant from Franklin Park to Elk Grove Village, Illinois.

26. The first step of the RIF was the implementation of a "special early retirement plan" ("The Plan"). The Plan targeted employees who were over 55 years of age and who had worked for Quasar in excess of 10 years. During April and May, 1986, when the older employees ostensibly were "deciding to accept early retirement," Quasar terminated many of its other employees, including Fortino, Meyers and Schulz.

27. In the course of the RIF, Quasar decentralized many of its sales functions, and reduced or eliminated certain traffic and transportation functions by transferring part of the Quasar warehouse function to Matsushita Industrial Company, a division of MEI. Quasar physically relocated its headquarters to Matsushita Industrial Company's Elk Grove Village warehouse/office facility. Despite the fact that Schulz was in charge of all product distribution for Quasar, Schulz was not informed of Quasar's decision to restructure Quasar's method of product distribution.

28. In 1985, Fortino supervised both the advertising and public relations functions at Quasar. In 1986, but prior to the RIF, Quasar split its advertising and public relations functions. Fortino supervised the advertising function; Thomas K. Lauterback ("Lauterback") supervised the public relations function. After the RIF, Quasar consolidated the advertising and public relations functions into a communications department, which Lauterback supervised.

29. In March, 1986, at the time of the RIF, Quasar employed a number of managerial employees of Japanese national origin, including: Tasuka Ikeda, Moritaka Saigusa, Konichi Nishikawa, Tsuneo Igarashi, Masafumi Omoto, Tetsu Kimoto, Joshiku Miyota, Fujio, Tsuji, Akira Mishima and Karl Matsuda. Each of these employees spoke English.

30. On March 31, 1986, pursuant to certain equal employment opportunity reporting requirements, Quasar reported that it had 422 employees at its Franklin Park facility. Of this number, Quasar reported that it had eighty white managerial employees and nine Pacific Islands managerial employees.

31. During the RIF, Quasar did not terminate any managerial level employees of Japanese national origin. Schupp, Quasar's head of personnel, testified that its managerial employees of Japanese national origin entered the United States on E–1

and E–2 visas. Quasar must certify that individuals entering the United States on such visas are well-qualified for employment and will not become unemployed. Assuming *arguendo* that this visa status prevented Quasar from terminating its managerial employees of Japanese national origin, it does not explain the differential treatment received by, and the increased salaries paid to, these employees.

32. During the RIF, Quasar terminated two of three *non*-managerial employees of Japanese national origin. The evidence offered at trial demonstrates that, during the RIF, Quasar also terminated many non-managerial employees of American national origin.

33. After the RIF, Quasar employed twenty-three managerial employees at its Franklin Park facility. Nine of the twenty-three employees were managerial employees of Japanese national origin. Thus, as a result of the RIF, the percentage of Quasar's managerial employees of Japanese national origin increased markedly. Matsuda was the only managerial employee of Japanese national origin to leave Quasar; however, Quasar neither terminated Matsuda nor offered him early retirement. Instead, Matsuda returned to Japan and transferred to a position at MEI. Clearly, neither Matsuda, nor any other managerial employee of Japanese national origin, was adversely affected by the RIF. Indeed, since 1982, various managerial employees of Japanese national origin have returned to Japan and to positions with MEI or its other subsidiaries.

34. Pluckhan testified that certain positions are reserved for, or assigned to, employees of Japanese national origin. Quasar made no attempt to fill these positions with employees of American national origin. Throughout the trial, Quasar offered evidence to suggest that the ability to speak Japanese was a requirement, or a prerequisite, for performing certain jobs at Quasar. For example, according to Pluckhan, the person employed in the position of

chief financial officer was required to speak Japanese in order to communicate with Quasar's parent company. Accordingly, since 1983, Quasar has employed only persons of Japanese national origin in this position. In fact, since 1983, Quasar has not attempted to fill this position with employees of American national origin.[1] Much of the evidence offered at trial demonstrated, however, that persons of American national origin capably performed marketing and financial functions, including travelling to and communicating with various divisions of Quasar's parent company, without speaking Japanese. Quasar has been a division of Matsushita since 1974. For more than a decade, the non-Japanese-speaking managerial employees of American national origin performed marketing and financial functions in conjunction with Matsushita. An ability to speak Japanese was not required to perform any marketing or financial function at Quasar.

35. Pluckhan testified that Quasar maintains a salary structure for its managerial employees of Japanese national origin different from the salary structure for its managerial employees of American national origin. The salary structure for Quasar's employees of Japanese national origin is adjusted in accordance with the following factors:

1) whether the employee lives in an apartment or owns a home;

2) the size of the employee's family; and,

3) whether the employee's children attend public or private schools.

In the two years prior to Quasar's RIF, while Quasar was losing money "hand over fist," Quasar substantially increased the salary of at least two of its managerial employees of Japanese national origin:

| Employee | Date | Salary |
| --- | --- | --- |
| Mr. Ikeda | 5/1/84 | $37,200 |
| | 7/1/84 | $56,640 |
| Mr. Mishima | 10/85 | $41,600 |
| | 4/86 | $68,160 |

---

**1.** At the trial, Quasar presented evidence that it had hired one Japanese-speaking person of American national origin in its managerial training program. Quasar no longer employs this individual.

According to Pluckhan, Ikeda and Mishima received these substantial increases to enable them to obtain larger living quarters and to educate their children in private schools. During this time period, Quasar did not increase the salaries of any managerial employees of American national origin unless such employees received job promotions. In fact, two months after Quasar increased Mishima's salary, Quasar began the RIF which resulted in the plaintiffs' terminations.

36. During the RIF, Quasar did not terminate any of the ten managerial employees of Japanese national origin. In fact, during the time period immediately preceding and continuing through the RIF, Quasar paid increased salaries to its managerial employees of Japanese national origin in accordance with the following schedule:

| Employee | Date | Salary |
| --- | --- | --- |
| Mr. Ikeda | 9/1/86 | $70,476 |
| | 4/1/87 | $71,436 |
| | 9/1/87 | $76,776 |
| Mr. Saigusa | 4/1/86 | $84,516 |
| | 9/1/87 | $85,816 |
| Mr. Nishikawa | 9/1/86 | $63,300 |
| | 9/1/87 | $67,860 |
| Mr. Igarashi | 9/1/86 | $71,640 |
| | 9/1/87 | $76,020 |
| Mr. Omoto | 9/1/86 | $71,640 |
| | 12/1/86 | $73,440 |
| | 9/1/87 | $75,744 |
| Mr. Kimoto | 9/1/86 | $75,168 |
| | 9/1/87 | $77,472 |
| Mr. Miyota | 9/1/86 | $62,376 |
| | 9/1/87 | $65,340 |

### C. *Quasar's Termination of Plaintiffs' Employment*

37. On Friday, May 23, 1986, with no prior notice, Quasar terminated Fortino, Schupp told Fortino that Quasar was disbanding its advertising department and that there was no place for Fortino with Quasar. Quasar simply transferred its advertising functions to its communications department. Quasar did not offer Fortino any position in the Communications Department. Schupp told Fortino that Quasar would "offer him early retirement" and that Fortino should pick up the early retirement forms the following Monday.

38. On Monday, May 26, 1986, Schupp told Fortino that Fortino would not receive any retirement benefits unless Fortino signed a document entitled "Separation Agreement and Release." Quasar did not require employees who were offered "early retirement" in April, and who "accepted early retirement" prior to May 16, 1986, to sign a Separation Agreement and Release. The document contained Quasar's promise to give neutral references to prospective employers, Quasar's promise not to contest Fortino's application for unemployment benefits, and a statement that Fortino agreed to terminate his employment with Quasar.

39. On May 30, 1986, Fortino signed the Separation Agreement and Release. Fortino testified that he did not understand the document and that he did not "knowingly and voluntarily" sign the document. This court finds that Fortino did not knowingly and voluntarily waive any rights against Quasar under Title VII.

40. Fortino testified that he did not voluntarily agree to terminate his employment with Quasar. The Separation Agreement, though silent regarding any claim under Title VII, expressly included a waiver of any claim for age discrimination. The jury returned a verdict in favor of Fortino on his claim of age discrimination. This court is bound by the jury's factual findings that are common to both claims. *See Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1293–94 (7th Cir.1987). Implicit in the jury's verdict on the age discrimination claim is the factual finding that Fortino did not voluntarily terminate his employment with Quasar. The overwhelming evidence demonstrates that neither Fortino, nor Meyers, nor Schulz voluntarily agreed to terminate their employment with Quasar. This finding is consistent with the jury's factual findings and verdicts on these plaintiffs' age discrimination claims.

41. Fortino's attempts to obtain employment were successful when in 1987 he obtained the position of sales representative

for Spectrum Graphics. His compensation in 1987 was $1,200 and in 1988, $11,000. Fortino was compensated strictly on a commission basis by Spectrum Graphics.

42. Plaintiffs' financial expert, Charles Sherfey ("Sherfey"), testified that the value of Fortino's lost benefits and salary prior to trial ("back pay"), was $177,550, deducting the amounts Fortino earned at Spectrum Graphics, and that the present cash value of Fortino's lost benefits and salary for the remainder of his work-life expectancy of 7.8 years from the date of the termination of his pay, factoring in his probability of death before then ("front pay"), was $331,299. The jury returned a verdict in favor of Fortino, awarded back and front pay in the amounts suggested by Sherfey and found that Quasar willfully violated the ADEA.

43. On May 23, 1986, without prior notice, Quasar terminated Meyers. In a meeting in Schupp's office, Schupp told Meyers that his job was being eliminated. Meyers asked Schupp to transfer him to another position with Quasar. Meyers also told Schupp that he was willing to take any position with Quasar or within the MEI organization. Meyers was capable of performing many of the positions that were performed by Quasar's managerial employees of Japanese national origin. Quasar did not offer any of these positions to Meyers.

44. Meyers contacted 300–400 executive search companies following his termination. He was only able to obtain temporary positions with H & R Block during the tax seasons and a company named Laminart. Meyers was unemployed at the time of trial.

45. Sherfey testified that the value of Meyers' lost benefits and salary prior to trial ("back pay") was $144,448, deducting the amounts earned by Meyers in his employment with H & R Block and Laminart, and that the present cash value of Meyers' lost benefits and salary for his work-life expectancy of approximately 11 years, factoring in his probability of death before then ("front pay") was $583,775. The jury returned a verdict in favor of Meyers,

awarded back and front pay in the amounts suggested by Sherfey and found that Quasar willfully violated the ADEA.

46. On June 17, 1986, without prior notice, Quasar informed Schulz that he would be terminated. Schulz was capable of performing many of the positions that were performed by Quasar's managerial employees of Japanese national origin. Quasar did not offer any of these positions to Schulz.

47. After Quasar terminated Schulz, Pluckhan provided Schulz with an excellent employment reference. Nevertheless, at trial, Pluckhan testified that Schulz was overqualified for many of the "new" positions created by the corporate restructuring which accompanied the RIF. This testimony about Schulz' qualification, or "overqualification," raises the factual inference that Schulz was capable of performing many of these "new" positions. This inference was not rebutted, and, in fact, is confirmed by the jury's finding that Schulz was performing in accordance with Quasar's legitimate expectation.

48. Schulz attempted to find employment through Lawrence & Allen, an outplacement firm. Schulz sent out approximately 3,300 resumes, but was unable to obtain a position. Schulz then purchased a hardware store, but had not realized any profits from that venture at the time of trial.

49. Sherfey testified that the value of Schulz' lost benefits and salary prior to the date the trial began ("back pay"), was $145,652, and the present cash value of Schulz' lost benefits and salary until he could be expected to retire, factoring in his probability of death before then ("front pay") and arriving at a work-life expectancy of 11.9 years from the date of the termination of Schulz' severance pay, was $567,256. The jury returned a verdict in favor of Schulz, awarded back and front pay in the amounts suggested by Sherfey and found that Quasar willfully violated the ADEA.

50. At all times relevant, Quasar maintained an Affirmative Action Program ("AAP") which required Quasar not to dis-

criminate on the basis of national origin. Schupp is responsible for implementing Quasar's AAP. Schupp testified that he is fully familiar with the laws which prohibit discrimination in employment. Nevertheless, Quasar did nothing to ensure that the RIF did not have an adverse impact upon persons in the protected age category. Similarly, Quasar offered no evidence to rebut the evidence that the RIF adversely affected managerial employees of American national origin. Accordingly, this court finds that Quasar was aware of its obligations under Title VII and that Quasar took no action to ensure that the RIF did not adversely impact managerial employees based upon their national origin. Moreover, Quasar's knowledge of its obligations under federal law prohibiting employment discrimination supports the inference that it acted in reckless disregard of the law in its treatment of the plaintiffs.

51. During the age discrimination portion of this trial, Quasar presented evidence that these plaintiffs were discharged because of Quasar's financial difficulties. Despite this evidence, the jury returned a verdict in favor of the plaintiffs and against Quasar on the plaintiffs' age discrimination claims. Furthermore, the jury found that Quasar willfully violated its obligations under the ADEA. The jury could only have returned such a verdict if it had been persuaded that Quasar's dire financial condition defense was either incredible or was a pretext for its discriminatory conduct. The court concurs in that finding.

52. These plaintiffs timely filed charges of discrimination against the defendant with the Equal Employment Opportunity Commission ("EEOC"). On March 20, 1987, the EEOC issued right to sue letters to the plaintiffs. Plaintiffs timely filed this action in this court on May 14, 1987.

53. In judging the credibility of each witness and the weight to be given the testimony of each, this court has taken into account the witness' intelligence, ability and opportunity to observe, age, memory, demeanor while testifying, any interest, bias or prejudice a witness may have and the reasonableness of the witness' testimony in light of all the evidence in the case. Guided by these standards, this court makes the following credibility findings:

a) With respect to John Fortino, Carl Meyers and F. William Schulz, this court finds that their testimony was knowledgeable, reliable, forthright, persuasive and entirely credible as to each and every matter to which each testified.

b) Where matters of proof overlapped between the Title VII claim and the ADEA claim, this court is bound by the jury's credibility findings. In the ADEA portion of this action, the jury found that Quasar impermissibly discriminated against the plaintiffs on the basis of their age and returned substantial verdicts in favor of the plaintiffs. The jury necessarily found the plaintiffs' testimony credible. Based on its own opportunity to observe and judge the witnesses' testimony, this court concurs in the jury's credibility finding.

c) With respect to Frederick Pluckhan, this court finds that his testimony was generally knowledgeable and reliable. This court specifically credits Pluckhan's testimony regarding Quasar's employment practices of segregating its managerial workforce along ethnic lines.

d) With respect to the testimony of Anthony Mirabelli, this court finds the witness was knowledgeable, reliable and credible. This court specifically credits Mirabelli's testimony regarding the plaintiffs' abilities to perform managerial positions reserved by Quasar for its managerial employees of Japanese national origin.

e) With respect to Charles Sherfey, the court finds that his testimony was credible, precise and knowledgeable. Sherfey's testimony as to his methodology and calculations of the plaintiffs' front and back pay was persuasive, straightforward and reasonable in light of all the evidence in the case.

f) With respect to the testimony of William Schupp, the court finds that the admissions and inconsistencies of his testimony cast doubt on its credibility and reliability. Accordingly, the court does not credit Schupp's testimony as to many of the matters to which he testified.

g) With respect to the testimony of Kenichi Nishikawa, the court finds it was not credible. Nishikawa's testimony also included damaging admissions, which reflected poorly on the other matters to which he testified.

h) With respect to Masafumi Omoto, the court finds his testimony was generally not credible. Omoto made admissions damaging to the defendant's case.

## II. CONCLUSIONS OF LAW

■ 1. Defendant, the Quasar Company, a Delaware corporation and a subsidiary of a Japanese corporation, is obligated to comply with American employment discrimination laws. *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982).

2. At all times relevant to this action, Quasar was an employer as defined by 42 U.S.C. § 2000e(b) and, thus, is subject to Title VII of the Civil Rights Act of 1964 ("Title VII"). 42 U.S.C. § 2000e *et seq.*

3. The plaintiffs fully complied with all jurisdictional prerequisites to bring an action under Title VII.

4. In relevant part, Section 703(a)(2) of Title VII makes it unlawful for an employer subject to the Act "to limit, segregate or classify its employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... national origin." 42 U.S.C. § 2000e–2(e). Employment discrimination based upon national origin violates Title VII. *See e.g. Bilka v. Pepe's, Inc.*, 601 F.Supp. 1254 (N.D.Ill.1985); *Thomas v. Rohner–Gehrig & Co.*, 582 F.Supp. 669 (N.D.Ill.1984); *Porto v. Canon, U.S.A., Inc.*, 28 FEP Cases 1679, 1981 WL 381 (N.D.Ill.1981).

■ 5. Quasar accomplished its discrimination by reserving certain of its managerial positions for employees of Japanese national origin, by evaluating and paying Quasar's managerial employees of Japanese national origin on an entirely different basis from that used to evaluate and pay Quasar's managerial employees of American national origin, and by exempting all of its managerial employees of Japanese national origin from Quasar's RIF, all without lawful justification.

6. In *Oxman v. WLS–TV*, 846 F.2d 448, 455 (7th Cir.1988), the Seventh Circuit set forth the elements a plaintiff must show to establish a *prima facie* case of employment discrimination in a RIF context. *Oxman* was an ADEA case. Its rationale, however, applies equally to claims of discrimination pursuant to Title VII. *See Oxman*, 846 F.2d at 452. These plaintiffs established a *prima facie* case by showing that they were members of a protected group, namely persons of American national origin, that they were performing according to Quasar's legitimate expectations, that Quasar terminated their employment, and that similarly situated managerial employees of Japanese national origin were treated more favorably.

7. Once the plaintiffs established the elements of a *prima facie* case, the burden shifted to Quasar to articulate lawful reasons for these plaintiffs' discharges. *See Oxman*, 846 F.2d at 453. Quasar introduced evidence that it discharged the plaintiffs because of its dire financial condition and that the ability to speak Japanese was necessary to perform certain positions which were reserved for managerial employees of Japanese national origin, to rebut plaintiffs' *prima facie* case.

8. After Quasar articulated a nondiscriminatory reason for these plaintiffs' discharges, the burden shifted back to plaintiffs to demonstrate that Quasar's proffered reasons were pretextual. Plaintiffs could have made such a demonstration in one of two ways: Plaintiffs could show either that the discriminatory reason more likely than not motivated Quasar or that Quasar's proffered explanations were not credible. *See Oxman*, 846 F.2d at 453 (citing *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984)).

9. Plaintiffs met this burden of proof by offering evidence that Quasar segregated and classified its managerial workforce along lines of national origin, that Quasar

used different systems to evaluate and pay its managerial employees of Japanese national origin, and that Quasar exempted managerial employees of Japanese national origin from the RIF. As a result of Quasar's discriminatory segregation of its workforce, and pursuant to its discriminatory system of evaluation and compensation, Quasar significantly enhanced the financial remuneration received by its managerial employees of Japanese national origin at the very time that Quasar was adversely affecting the employment of its managerial employees of American national origin. This evidence raised the inference not only that Quasar's proffered nondiscriminatory reason of its financial condition was incredible, but also that this defense was pretextual.

10. Furthermore, the evidence presented at trial demonstrated that Quasar's other proffered nondiscriminatory reason for plaintiffs' discharges—*i.e.*, that the ability to speak Japanese was necessary to perform certain positions—was pretextual. Specifically, plaintiffs elicited testimony and evidence which demonstrated that, in the past, many managerial employees of American national origin who did not speak Japanese performed the marketing, financial and managerial duties which Quasar suddenly contended could only be performed by employees of Japanese national origin, including travelling to Japan and communicating with employees located in Japan.

11. As a matter of law, this court concludes that Quasar impermissibly discriminated against plaintiffs on the basis of their American national origin when Quasar terminated their employment. Quasar would not have discharged the plaintiffs but for their national origin.

12. The evidence of record in this action demonstrates that Quasar had many positions for which each of these plaintiffs was qualified. Quasar never offered such positions to any of the plaintiffs. The testimony at trial demonstrates that Quasar was prepared to "defend" its decisions to offer employment opportunities to others for a variety of reasons. That is, if asked why

any of the plaintiffs were not offered a position, Quasar would provide a "reason" —sometimes without ascertaining whether the "reason" applied. For example, Quasar determined that these plaintiffs would not relocate—without consulting plaintiffs.

13. The court also finds as a matter of law that plaintiffs exercised every effort to mitigate their damages by obtaining other employment. Accordingly, the court finds in favor of the plaintiffs and against the defendant as to Counts II, IV and VI.

14. The damages assessed by the jury with respect to the plaintiffs' age claims are supported by the evidence and exceed the damages which the court might reasonably award under Title VII, not only because of the jury finding that the defendant willfully violated the ADEA, but also because the remedial scheme of the ADEA is more generous than that of Title VII. *McKnight v. General Motors Corp.*, 908 F.2d 104, 117 (7th Cir.1989). The court, however, notes that if the jury verdicts did not fully remedy the defendant's discrimination as to these plaintiffs, the court would award the plaintiffs back and front pay as to the Title VII claims in the same amounts actually awarded by the jury.

### III. POST–TRIAL MOTIONS

Also pending before the court are the parties' post-trial motions. Plaintiffs move for prejudgment interest and defendant moves to revise non-final judgment, or alternatively to alter or amend the judgment.

#### A. *Defendant's Motion to Amend the Judgment*

Defendant sought at trial to exclude any evidence relating to front pay, arguing that a determination with respect to front pay should be reserved to the court. (Defendant's Motion in Limine to Exclude Evidence Regarding Front Pay or Benefits). The court denied the defendant's motion in limine pursuant to *Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321 (7th Cir.1987) *vacated on other grounds* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988). In *Coston*, the Seventh Circuit stated that: "Authority and reason both suggest that while the decision to award front pay is

within the discretion of the trial court, the amount of damages available is a jury question." *Coston*, 831 F.2d at 1337, n. 4.

Following the jury verdicts in favor of the plaintiffs awarding back pay, front pay and finding that the defendant's violation of the ADEA was willful, defendant filed the motion to amend the judgment. The motion argues that: front pay should not have been awarded because liquidated damages were awarded; the court should have determined the amount and availability of front pay; and the plaintiffs' back and front pay awards should have been measured against the jobs they sought. The liquidated damages referred to in the defendant's motion were awarded by the court following the jury verdict finding that the defendant's violation of the ADEA was a willful violation. The court doubled the damages awarded by the jury for front and back pay in awarding the liquidated damages.

■ The defendant's memorandum in support of the motion first argued that the court impermissibly doubled the award of the front pay as part of the liquidated damage award. Defendant bases this contention on its analysis of the following provisions of the ADEA and the Fair Labor Standards Act ("FLSA"), respectively:

The provisions of the chapter shall be enforced in accordance with ... section [ ] ... 216 ... of this title ... Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this section [ ] 216 ... Provided, that liquidated damages shall be payable only in cases of willful violations of this chapter. In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section.

29 U.S.C. § 626(b).

Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b).

Defendant correctly argues that the court should not consider front pay as a component of the "amounts owing" under section 626(b) in calculating liquidated damages, because the reference to reinstatement in the statute follows the reference to "amounts owing" and front pay is a prospective remedy. *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1210 (7th Cir. 1989). It follows from this analysis and is the law in this Circuit that because front pay is not mentioned explicitly in the statute itself, front pay is only awarded in lieu of reinstatement. Accordingly, the court will amend the judgment to reflect the doubling of the back pay award only for liquidated damages.

■ Defendant argues, however, that because front pay is awarded in lieu of reinstatement, it must not only be awarded by the district judge, but also the amount awarded must be determined by the judge. The defendant engages in semantics. An award of reinstatement is an equitable remedy committed to the discretion of the district judge and is preferable to an award of front pay. *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1055 (7th Cir.1990). It is also true that if the district judge considers the Seventh Circuit's *McNeil* factors and determines that reinstatement is inappropriate under the facts of a given case, the judge may consider front pay as an alternative to reinstatement. The alternative remedies of reinstatement or front pay are available in the event that some further award is necessary to make the plaintiff whole. In that respect the defendant's analysis that the availability of front pay must be determined by the judge is accurate. The judge must consider the options of reinstatement or front pay. The defendant is arguing, however, that the jury is incapable of de-

termining the amount of front pay appropriately awarded. There is a split of authority as to whom should decide the amount of front pay damages to be awarded. *Compare Fite v. First Tennessee Production Credit Ass'n,* 861 F.2d 884, 893 (6th Cir.1988) (jury question); *Hansard v. Pepsi–Cola Metropolitan Bottling Co., Inc.,* 865 F.2d 1461 (5th Cir.1989) (jury question); *Coston v. Plitt Theatres, Inc.,* 831 F.2d 1321, 1337, n. 4 (7th Cir.1987) (jury question) *vacated and remanded on other grounds* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988); *Maxfield v. Sinclair International,* 766 F.2d 788, 795–96 (3d Cir.1985) (jury question) *cert. denied* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); *Davis v. Combustion Engineering, Inc.,* 742 F.2d 916, 922 (6th Cir.1984) (jury question); *Eivins v. Adventist Health System/Eastern & Middle America, Inc.,* 660 F.Supp. 1255, 1264 (D.Kan.1987) (jury question); *with Dominic v. Consolidated Edison Co.,* 822 F.2d 1249 (2d Cir.1987) (issue for the court); *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 616 (1st Cir.1985) (issue for the court); *Miller v. Pabst Brewing Co.,* 670 F.Supp. 1420 (E.D.Wis.1987) (issue for the court), *affirmed on other grounds* 870 F.2d 1198, 1206 (7th Cir.1989) ("we need not address the difficult question whether a jury trial is available with respect to an award of front pay under the ADEA"). Even if the court were not bound by the relevant Seventh Circuit precedent,[2] assessing damages is clearly within the competence of a jury. Moreover, in the case of a front pay award, unlike other damage awards, there is the additional protection afforded the defendant in the judge's determination whether front pay may appropriately be awarded at all, which involves consideration of many factors, outlined below, not the least of which is the degree to which the jury must

engage in speculation in awarding such damages. Finally, even though front pay is an alternative remedy to reinstatement, it is a legal remedy, not an equitable one. *McKnight v. General Motors Corp.,* 908 F.2d 104, 117 (7th Cir.1990).

■ Defendant also argues that front pay is not appropriately awarded where liquidated damages have been awarded. Yet, the authority upon which defendant relies clearly states that the award of liquidated damages is one factor to be considered in awarding front pay and does *not* stand for the proposition that front pay and liquidated damages may *never* be awarded to the same plaintiff. *See e.g. Graefenhain v. Pabst Brewing Co.,* 870 F.2d 1198, 1205 (7th Cir.1989); *McNeil v. Economics Laboratory, Inc.,* 800 F.2d 111, 118–19 (7th Cir.1986), *cert. denied* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). The authorities cited by the defendant recognize that the decision to award front pay is neither in lieu of liquidated damages nor is it as simplistic as the defendant represents it to be.

This court determines that reinstatement is not a proper remedy under the facts of this case. In this case, no offer of reinstatement has been made and it was represented to the court that the defendant would not rehire the plaintiffs and the relationship between the parties is clearly hostile. Moreover, the period of time for which front pay was assessed was relatively short given the plaintiffs' career path with the defendant and the court's findings of fact reflect the plaintiff's unsuccessful attempts in mitigation of damages and their inability to find truly comparable employment.

The court also finds that the award of front pay damages is appropriate under the facts of this case. Again, the relatively

---

**2.** The defendant persuasively urges, by means of a two and one-half page string cite, that the court is bound by the decisions of the Seventh Circuit Court of Appeals in the context of denying plaintiffs' motion for prejudgment interest. (Defendant's Response to Plaintiffs' Memorandum Concerning Impact, pp. 2–4) Because the cases cited by the defendant are not limited to the award of prejudgment interest, the court

must assume the defendant would concede the application of the same principal in this context. The court also assumes the point must be conceded even though the defendant's brief applauds what it *characterizes* as the district judge's decision in *Miller* not to follow relevant Seventh Circuit precedent on whether the amount of front pay awarded is a jury issue.

short period of time for which these damages were assessed by the jury weighs in favor of the award. This is not a case in which an award of front pay is speculative. That is so because the evidence at trial demonstrated that these plaintiffs were virtually model, career employees. It does not take any leap of faith to conclude that but for the defendant's discrimination, these men would have enjoyed continued employment until retirement. Moreover, the plaintiffs' attempts to mitigate their damages support the conclusion that the award of front pay is not a windfall to plaintiffs. In short, if front pay is not justified under the facts of this case, it is hard to imagine any set of circumstances under which it would be. Finally, although front pay may be less appropriate where there is an award of liquidated damages following the jury's finding that the defendant's conduct was willful, the balance of factors weighs so heavily in favor of the award of front pay in this case that to deny it would be an injustice. "A substantial liquidated damages award only makes front pay less appropriate if a front pay award would be highly speculative due to the lengthy period for which damages are sought and the lack of certainty that plaintiff would have remained employed during such a lengthy period." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1205 (7th Cir.1989).

■ The final argument raised in the defendant's motion is that the plaintiffs' back and front pay awards should have been measured against the jobs they sought. Defendant claims that because one of the plaintiffs' theories at trial was that the defendant could have found the plaintiffs other positions at Quasar, the plaintiffs' damages should have been measured against the salaries applicable to those positions. The court rejects the defendant's argument. Quasar never offered the plaintiffs these positions and can hardly argue now that the salaries should apply. "[F]or purposes of calculating back pay, the appropriate comparison is the position that the plaintiff would have occupied had no violation occurred rather than a non-discriminatory alternative," even

though the plaintiffs testified they would have accepted non-discriminatory, lower-paying positions. *Metz v. Transit Mix, Inc.*, 692 F.Supp. 987, 939 (N.D.Ind.1988). Moreover, the facts of this case are distinguishable even from *Metz* in that the positions which plaintiffs would have accepted were not non-discriminatory alternatives, i.e. the defendant could not permissibly raise the salaries of its managerial employees of Japanese national origin and demote its managerial employees of American national origin. Accordingly, the defendant's motion to amend the judgment in this case is granted in part and denied in part. The judgment will be amended only to the extent that the liquidated damage award will be revised so that it reflects the doubling of the back pay awards only. The motion is denied to the extent that the front pay award will not be vacated or reduced.

## B. *Plaintiffs' Motion for Prejudgment Interest*

■ Plaintiffs' motion for prejudgment interest must be denied because of the Seventh Circuit's interim opinion in *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198 (7th Cir.1989), which held that an award of back pay liquidated damages precludes the award of prejudgment interest. The court does, however, award post-judgment interest. 28 U.S.C. § 1961(a); *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101 (7th Cir.1990). Also the plaintiffs are entitled to attorneys' fees and costs as prevailing parties. 29 U.S.C. §§ 626(b)(ADEA) and 216(b)(FLSA); 42 U.S.C. § 2000e–5(k) (Title VII); 28 U.S.C. § 1920. The plaintiffs' attorneys are directed to submit a petition for attorneys' fees and costs within 30 days of receipt of this opinion and order.

## IV. CONCLUSION

The court enters judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure in favor of plaintiffs Fortino, Meyers and Schulz and against the defendant as to Counts II, IV and VI of the complaint. Defendant's motion to amend the judgment is granted in part and denied in part. Plaintiffs' motion for prejudgment interest

is denied. Plaintiffs' attorneys are directed to submit a petition for attorneys' fees and costs within 30 days of receipt of this memorandum opinion and order.